IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, JAMES BOLAND, GERALD                    )
O'MALLEY, KEN LAMBERT, GERARD SCARANO,              )
H. J. BRAMLETT, EUGENE GEORGE, PAUL                 )
SONGER, WILLIAM MCCONNELL, CHARLES                  )
VELARDO, MATTHEW AQUILINE, GREGORY R.               )
HESS, MICHAEL SCHMERBECK, VINCENT                   )
DELAZZERO, and BENJAMIN CAPP                        )
as Trustees of, and on behalf of, the              )
BRICKLAYERS & TROWEL TRADES                         )
INTERNATIONAL PENSION FUND                          )
    620 F Street, N.W.                         )
    Washington, DC  20004                      )
    (202) 783-3788,                            )
                                                    )
JIM ALLEN, MATTHEW AQUILINE, LON BEST,              )
JAMES BOLAND, TED CHAMP, RAYMOND                    )
CHAPMAN, VINCENT DELAZZERO, BRUCE                   )
DEXTER, JOHN FLYNN, EUGENE GEORGE,                  )
GREGORY HESS, FRED KINATEDER, DAN                   )
KWIATKOWSKI, KEN LAMBERT, SANTO                     )
LANZAFAME, DICK LAUBER, WILLIAM                     )
MCCONNELL, EDWARD NAVARRO, GERALD                   )
O'MALLEY, JOHN PHILLIPS, CHARLES RASO,              )
MARK ROSE, KEVIN RYAN, GERARD SCARANO,              )
MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH             )
SPERANZA, and FRED VAUTOUR                          )
as Trustees of, and on behalf of, the              )
INTERNATIONAL MASONRY INSTITUTE                     )
    620 F Street, N.W.                         )
    Washington, DC  20004                      )
    (202) 783-3788,                            )
                                                    )
    and,                                       )
                                                    )
JOHN FLYNN, JAMES BOLAND, GERALD                    )
O'MALLEY, EUGENE GEORGE, MATTHEW                    )
AQUILINE, MICHAEL SCHMERBECK, GREGORY               )
HESS, AND PAUL SONGER                               )
as Trustees of, and on behalf of, the              )
BRICKLAYERS & TROWEL TRADES                         )
INTERNATIONAL HEALTH FUND                           )
    620 F Street, N.W.                         )
    Washington, DC 20004                       )
    (202) 783-3788,                            )
                                                    )

|                                              |   |                 |
|----------------------------------------------|---|-----------------|
| Plaintiffs,                                  | ) |                 |
|                                              | ) |                 |
|                                              | ) |                 |
| v.                                           | ) | Civil Action No.|
|                                              | ) |                 |
| EMPIRE REFRACTORY SPECIALISTS, INC.          | ) |                 |
| 1273 24th Avenue                             | ) |                 |
| Hueytown, AL  35023                          | ) |                 |
| (205) 426-4000,                              | ) |                 |
|                                              | ) |                 |
| Defendant.                                   | ) |                 |
|                                              | ) |                 |

## COMPLAINT

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the Defendant, allege as follows:

### CAUSE OF ACTION
#### Jurisdiction and Venue

1. This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund"), the fiduciaries of the International Masonry Institute ("IMI"), and the fiduciaries of the Bricklayers & Trowel Trades International Health Fund ("IHF") to enforce the terms of the Plan and Trust Agreements adopted by the IPF, IMI and IHF and the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This action arises under the laws of the United States, specifically Section 502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145. Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court as to the claims brought on behalf of the IPF, IMI and IHF.

2. The IPF, IMI and IHF are administered in the District of Columbia. Venue for the claims asserted by the IPF, IMI and IHF are conferred on this Court

DSMDB-2293230

pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

### Parties

3. Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, William McConnell, Charles Velardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Ben Capp, are Trustees of, and sue on behalf of, the IPF. The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). Plaintiffs bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4. The IPF is also authorized to effect collections on behalf of the IHF and IMI, pursuant to a written Assignment of Claims and the Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers ("Collection Procedures").

5. Plaintiffs, Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phillips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, are Trustees of, and sue on behalf of the IMI. The IMI is an "employee benefit plan" within the meaning of Section 3(3) of

DSMDB-2293230

ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IMI trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IMI in their respective capacities as fiduciaries.

6. Plantiffs, John Flynn, James Boland, Gerald O'Malley, Eugene George, Matthew Aquiline, Michael Schmerbeck, Gregory Hess and Paul Songer, are trustees of, and sue on behalf of the IHF. The IHF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IHF trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IHF in their respective capacities as fiduciaries.

7. Defendant, Empire Refractory Specialists, Inc. ("Empire Refractory Specialists") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of Alabama.

8. Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

## **Violation Charged**

9. Empire Refractory Specialists acting through its authorized agent or officer, executed a collective bargaining agreement with the Union. That collective bargaining agreement is annexed hereto as Exhibit A and is hereinafter referred to as the "Agreement".

10. Pursuant to the Agreement, Defendant agreed to make certain payments to the IPF, IMI and IHF on behalf of covered employees of Defendant.

DSMDB-2293230

11. Having submitted some contributions, Defendant has demonstrated an awareness of the obligation to make those payments.

12. Upon information and belief, Defendant has failed to properly submit required reports and contributions for hours worked pursuant to the Agreement.

13. Plaintiffs seek to conduct an audit of Defendant's books and records in order to determine any amounts which may be owed for work covered by the Agreement.

14. Under the terms of the Plan and Trust Agreements adopted by the IPF, IMI and IHF Board of Trustees, the CCU Procedures and Supreme Court precedent, Plaintiffs are entitled to conduct an audit of the books and records of Defendant to determine whether contributions have been made in compliance with Defendant's obligations.

15. Under the terms of the Plan and Trust Agreements adopted by the IPF, IMI and IHF Boards of Trustees, Plaintiffs are entitled to recover any delinquent contributions found due by the audit, as well as interest, calculated at 15 percent per annum, and the greater of either liquidated damages, calculated at 20 percent, or an additional computation of interest, calculated at 15 percent on the aforementioned delinquent contributions.

16. Despite several requests by the IPF or a representative of the IPF for access to Defendant's books and records so that the IPF auditor can determine whether contributions have been made in compliance with Defendant's obligations, Defendant has failed to grant the IPF auditor such access to their books and records.

DSMDB-2293230

17. Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to make contributions in accordance with the terms and conditions of the Agreement.

18.    WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1. For an order directing Defendant Empire Refractory Specialists to turn over to Plaintiffs' auditor its books and records for the time period January 2004 through December 2006, but not limited to, payroll records and the general ledger(s).  Plaintiffs will suffer irreparable injury in the absence of such injunctive relief and there is no adequate remedy at law.

Plaintiffs seek an order granting it:

        a.  Preliminary injunctive relief and

        b.  Permanent injunctive relief.

2.  For any amounts determined owed the IPF, IMI and IHF by Defendant, which are not yet ascertainable until an audit is conducted.

        a.  for the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D));

3.  In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

DSMDB-2293230

4.  That Defendant be directed to comply with its obligations to correctly report and to contribute to the IPF, IMI and IHF all additional reports and contributions due and owing, and to pay the costs and disbursements of this action.

5.  Such other relief as this Court deems appropriate, including judgment for any contributions and/or interest thereon that may accrue subsequent to the filing of this complaint, as well as any resulting statutory damages thereon under ERISA.

Dated: September __7__, 2007

By:_____

Ira R. Mitzner, DC Bar No. 184584
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200

Attorney for Plaintiffs

DSMDB-2293230

**EXHIBIT A**

07-11-07    16:00    From-IUBAC                    2023930219              T-534    P 003/022    F-821



# BRICKLAYERS'
# NATIONAL AGREEMENT
# FOR
# REFRACTORY
# CONSTRUCTION

### Between the

### International Union of
### Bricklayers and Allied Craftsmen

### and

### Signatory Refractory Contractors

To foster the principles of collective bargaining, to promote closer
working relationships between employers and employees engaged in the
refractory industry, to provide a peaceful means for the settlement of
grievances and disputes, to eliminate the necessity for strikes and
lockouts, to promote safe working sites, to develop uniform working
conditions for this specialized segment of the construction industry, and
to establish rates of wages, hours and conditions of employment, we, the
Signatory Refractory Contractors, and the International Union of
Bricklayers and Allied Craftsmen, do adopt the following Agreement as the
basis of our relations.

The International Union of Bricklayers and Allied Craftsmen shall
hereinafter be referred to as the "Bricklayers and Allied Craftsmen," "BAC"
or the "International Union." Local Unions, District Councils and
Conferences of the International Union of Bricklayers and Allied Craftsmen
shall hereinafter be referred to collectively as the "Union." The
Signatory Refractory Contractors shall hereinafter be referred to as the
"Employer."

ARTICLE I          This Agreement, executed to be effective this _____ day
Duration           of _____, 19___, between the signatory International
                   Union and each of the signatory Employers, shall remain
in effect for two (2) years and shall be automatically continued yearly
thereafter unless notice of modification or termination is given by
certified mail in writing by either party to the other at least sixty (60)
days but no more than ninety (90) days prior to the anniversary date. The
parties may at any time mutually agree to change or amend any part of this
Agreement and such changes or modifications shall not affect the continuing
nature of this Agreement.

ARTICLE II         This Agreement shall be in effect within the boundaries
Scope              of the United States and all possessions and
                   territorial dependencies.

     A. This Agreement shall apply to all new refractory
construction, all refractory maintenance and repair projects, and all on-
going plant refractory maintenance(i.e., plant refractory maintenance
performed by steady, full time employees who are part of a work force
having assured employment for a minimum of twelve months) contracted for by
Employers operating regionally and nationally in industrial plants such as,
but not limited to, mining facilities, manufacturing plants, power plants,
iron and steel production facilities, nonferrous metal production
facilities, paper mills, cement plants, breweries, rubber production and
tire manufacturing plants, refineries and synthetic fuel manufacturing
facilities.

     B. It is agreed that all work performed under the
National Stack Agreements, Acid Tile & Tank Agreements, and Cooling Tower
Agreements is specifically excluded from the terms of this Agreement.

C. The Employer agrees to assign to employees represented by BAC all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftsmen, including but not limited to: dipping, setting, buttering, bedding, hanging, pointing, grouting, caulking, cutting, toothing, fitting, plumbing, aligning, laying, flagging, leveling, installation of gaskets and expansion joint material, grinding, vibrating, tamping, guniting, insulating, and spraying of all refractory materials, anchoring of all refractory materials by all means including bolting and welding, ceramic welding, removal and cleaning of masonry materials to be reinstalled, final sandblasting of surfaces to receive additional refractory materials, installation of chemical coatings, fire-proofing, amd membrane materials by any method required, surface spraying of all refractory materials, and cleaning of coke oven walls, chambers and flues. Temporary bracing in coke oven repairs shall be done by employees represented by BAC, in coordination with other trades.

D. In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

E. If a jurisdictional dispute arises over an assignment of work by the Employer and it cannot be resolved at the local level, it shall be referred to the General Presidents of the disputing Unions for resolution.

ARTICLE III
Administration
of Agreement

A. Pursuant to the applicable provisions of the Labor Management Cooperation Act of 1978, 29 USC 173 (e), 175 (a), the parties to this Agreement shall establish a National Refractory Industry Joint Committee (hereinafter referred to as the "Joint Committee") consisting of an equal number of Employers and International Union representatives. Total membership on this Committee shall not exceed twenty (20) members. The Employers and International Union representatives shall have an equal number of votes on all matters coming before the Joint Committee, regardless of the number of Employer or Union representatives present at a session. The parties to this Agreement shall set forth in separate bylaws the method of operation of the Committee, which shall be consistent with the terms of this Agreement.

B. The Joint Committee shall have general responsibility for the improvement of labor-management relations in the industry, training, settlement of grievances, industry promotion, research and development and like matters of mutual interest to the Employers and the International Union. The Joint Committee is empowered to appoint such subcommittees as are necessary and appropriate to effectuate the purposes of this section.

C. The Joint Committee shall select from among its members two Co-Chairmen; one from the Employers, the other from the International Union. The Co-Chairmen shall serve for a period of one year or until their successors have been selected in accordance with the Committee's bylaws.

D. The Joint Committee shall meet regularly on a quarterly basis and at such other times as the Co-Chairmen deem necessary or appropriate.  Quarterly meetings may be suspended or postponed by mutual agreement of the Co-Chairmen, except that the Co-Chairmen may not suspend more than three quarterly meetings in succession.

E. The Joint Committee shall establish a business office in the Washington, D.C. area, hire a staff, and provide operational guidelines to be followed in the administration of this Agreement in the best interests of the industry being served as well as the employers and employees engaged in the refractory industry under the terms of this Agreement

| ARTICLE IV Management Recognition and Rights | Except as otherwise provided herein the Employer shall have the right to hire, fire, suspend or discipline for just cause, direct the working force, and manage its business in accordance with its judgment. |
|---|---|

| ARTICLE V Union Recognition, Union Security | A. Union Recognition.  The Employer hereby recognizes acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Section C of Article II, |
|---|---|

and in the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftsmen, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B. Union Security.  No later than eight (8) days following the effective date of this Agreement, all present employees working under the terms of this Agreement must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended.

Failure of any employee to comply with the provisions of this subsection shall, upon request of the jobsite Union, result in the termination of such employee.  The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members, or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.  This clause shall not be effective in those states prohibiting such Union Security, provided, however, that where an Agency Shop is lawful in such State, conformity therewith shall be a condition of employment in accordance with the conditions set forth in Section 8 of the National Labor Relations Act, as amended.

ARTICLE VI
Hiring of Men
Local Preference

The Employer shall notify the Union having jobsite jurisdiction upon being awarded a contract within the area covered by the local.

A. Prior to commencing work in an area the Employer shall contract the Business Manager of the Union in the area where the job is located and if the project is going to employ more than three (3) employees or at last longer than three (3) days, the Employer and the Union shall schedule a pre-job conference to discuss labor requirements. If the Employer has difficulty in contacting the representative of the Union, the Employer shall send a telegram to the office of the Union prior to beginning any work on the project. In the event either party fails or refuses to comply with this provision, the other party may file a complaint with the Joint Committee which, upon a finding of failure or refusal to comply, can asses a fine against the non-complying party in an amount not to exceed $1,000 to be deposited to the Joint Committee Administrative Fund.

B. The International Union and the Employers recognize the specialized nature of the work covered under this Agreement. The selection and appointment of foremen and general foremen, if required, shall be the responsibility of the Employer. Such employees shall be subject to the Union Security provision contained in Article V. Section B of this Agreement. The Employer hereby agrees to give preference when hiring foremen and their crews to employees residing or normally employed in the geographical area covered by the Union having jobsite jurisdiction. These employees shall be qualified journeymen for this type of work. Layoff shall be in reverse order of hire while recognizing that certain skills may be required to complete the project.

C. In order to train sufficient skilled mechanics for the refractory industry, the necessity for employment of apprentices is recognized and encouraged by the parties to this Agreement. It is agreed that the ratio of apprentices to journeymen for all work covered by this Agreement shall be one (1) apprentice registered with the Union, for every five (5) journeymen, whenever sufficient numbers of apprentices are available within the geographical jurisdiction of the jobsite Union. An apprentice from within the geographical jurisdiction of jobsite Union shall be employed for every traveling apprentice. A maximum of three (3) traveling apprentices may be employed on any one project unless otherwise mutually agreed by the Employer and Union.

ARTICLE VII
Hiring or
Referral
Systems

When there is in effect in any locality a union hiring hall or job referral system, the hiring of employees shall be in accordance with such systems providing:

A. The Employer shall have the right to determine the competency and qualifications of men referred by the Union and the right to hire or not hire accordingly.

B. The selection of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, union membership, bylaws, rules, regulations,

constitutional provisions or any other aspect or obligation of union membership, policies or requirements.

        C. If there are absentees at any time, work shall proceed without interruption or slowdown. The Employer shall promptly contact the Union for replacements or additional manpower, if needed.

        In all other areas where there is in effect no union hiring hall or job referral system, the provisions of Article VI of the Agreement shall govern the hiring procedures.

ARTICLE VIII    A. The gross wage and benefit contribution rates for
Wages and     all new refractory construction and all refractory
Contributions   maintenance and repair projects covered under this
              Agreement shall be contained in Addendum A in a
specified schedule of gross rates keyed to the index of local union jurisdictions. The parties to this Agreement recognize the potential inequities and destabilizing effects which would occur in Union jurisdictions when the difference in effective dates of wage and benefit increases under a local agreement and adjustments to the gross wage and contribution rates under this Agreement result in a higher local rate being in effect in an area. Therefore, the parties agree that whenever the effective gross wage and contribution rate negotiated between the Union and the recognized employer group or association is increased to an amount less than fifty cents (.50) below the gross rate established for that jurisdiction in Addendum A of this Agreement, the Employer will pay a gross rate which is fifty cents (.50) above the rate negotiated between the Union and recognized employer group until the next wage adjustment period established under this Agreement. The base zone rate in areas with zone rates shall be the applicable rate recognized under this exception to Addendum A.

        The gross wage and benefit contributions for on-going plant refractory maintenance work as defined in Article II, Section A, shall be contained in an Addendum C which shall also contain any other terms for in-plant work which differs from the other terms of this agreement.

        B. Addendum A to this Agreement shall be automatically revised every six (6) months beginning on 1 January 1984 to adjust the gross rate in the manner embodied in the initial Addendum A schedule for each Union which has had a change in wages and/or contributions during the previous six (6) months, to reflect any changes in local union geographic jurisdiction and to include any further modifications agreed upon between the Employers and the International Union. The Employers and the International Union agree that either party may request further revisions in Addendum A by serving a written request by certified mail to the other party at least sixty (60) but no more than ninety (90) days prior to the six (6) month revision date. In the event either party requests such revisions the parties agree to meet to discuss and take action upon the requested revisions. If the parties should fail to agree upon such a request on or before fifteen (15) days prior to the revision date, it is agreed that those items in dispute shall be submitted to an impartial arbitrator in accordance with the procedure contained in Article IX, Sections E (2) and (3) for prompt resolution. The impartial arbitrator shall act alone in the resolution of a disagreement under this Section, and

07-11-07   16:03   From-IUBAC                     2023930219           T-534   P 008/022   F-821

his decision shall be final and binding.  Any change in the Addendum A schedule shall be retroactive to the revision date.

C. In addition to the wage schedule herein provided for, the Employer agrees to pay:

1. Four cents (.04) to the International Masonry Institute (IMI) for each hour or portion thereof for which a covered employee receives pay exclusive of any overtime premiums.  This four cents (.04) to be the total amount paid to IMI so that any part of this contribution which is paid to IMI through the local remittance report shall be deducted for this amount.

2. Ten cents (.10) to the Joint Committee Administrative Fund for each hour or portion thereof for which a covered employee receives pay exclusive of any overtime premiums.  The funds received by the Joint Committee shall be utilized for an administrative staff, office space and related expenses and travel expense reimbursement, as provided for in Article III, Section E.

3. These payments to be made by check forwarded to the address established by the Joint Committee by the fifteenth (15th) day of the month for all hours of employment during the previous month.  The Employers agree to submit along with their payments legible copies of the completed remittance report forms for contributions to local benefit funds for the files of the Joint Committee.  Failure to pay these funds or submit copies of the local report forms shall be deemed a breach of this Agreement.

D. The Employer agrees to deduct an amount from the pay of each employee who executes a voluntary check-off authorization form. Deductions shall be made weekly at the rate specified on the check-off authorization form or as otherwise specified under the terms of the jobsite local agreement.  These transmittals to the authorized unit of the Union shall occur on a monthly basis, and shall be accompanied by a list of the names of those employees for whom deductions have been made and the amount deducted for each employee.

The deduction shall continue for the life of this Agreement for those employees who sign authorization forms unless they are revoked sixty (60) days prior to their anniversary date individually and in writing.

E. Where the jobsite Union agreement requires employer contributions to a trust or trusts which meet the requirements of Section 302 of the Labor Management Relations Act of 1947, 29 USC 186, or any other contributions such as apprentice or journeymen training funds, and promotion or administrative funds, negotiated through bona fide collective bargaining, upon request the Employer will be presented with a copy of the trust agreements and declarations of trust and the Employer hereby agrees to accept and be bound by the terms, conditions and provisions of said agreement and to make the contributions called for by said agreements at the rate and in the manner specified therein subject to the limitations contained in Article XII, Section B (3) of this Agreement.  It is agreed by the parties to this Agreement that the contributions specified for such benefit programs are included in the amounts contained in the Schedule attached as Addendum A.

F. After the Employer's operation has commenced in any area, no subsequent change in the fringe benefit funds or other contributions required under Sections D and E, above, will become effective insofar as the Employer is concerned, except to the extent that any changes in the rates of contribution may have been agreed upon in negotiations between the Union having jurisdiction over the area and a recognized bargaining group of contractors in such area. The Employer agrees to accept the new contribution rates agreed upon and to pay rates retroactively to the effective date applicable to the Employer's operation in such area. Any such changes in contribution rates shall continue to be included in the rates specified in the Wage Schedule attached as Addendum A.

G. In addition to the wages and other payments herein provided for, the Employer will be bound by the terms, conditions and provisions of the trust agreements governing administration of all Funds and irrevocably designates as its representatives on the Board of Trustees of said Fund such trustees as are named in the trust agreements as employer trustees, together with their successors selected in the manner provided for in said agreements and agrees to be bound by all lawful actions taken by said trustees pursuant to the said agreements.

H. Prior to commencing any work covered by this Agreement, the Employer shall obtain a bond in an amount up to $100,00 in the appropriate category as established and periodically reviewed by the Joint Committee with a duly qualified bonding company in a form approved by the International Union, to secure payment of wages, fringe benefits and other sums due under this Agreement.

ARTICLE IX
Grievance and
Procedure

A. The Joint Committee shall select from among its members a National Joint Administrative Board consisting of four (4) Employer representatives and four (4) International Union representatives to resolve disputes over the interpretation and application of this Agreement. The Committee shall in addition establish Regional Joint Administrative Boards consisting of three (3) representatives of signatory contractors and three (3) representatives designated by the International Union.

B. It is specifically agreed that any controversy arising on any jobsite covered by this Agreement involving the interpretation of its terms and conditions, other than a jurisdictional dispute over the assignment of work, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the Union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C. Grievances shall be handled in the following manner:

1. The grievance shall be referred to the jobsite Local Union steward and to the Employer's representative at the jobsite for adjustment.

2. If the grievance cannot be settled immediately pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the jobsite Local Union Business Manager and to the Employer's representative.

3. If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the International Union and the designated representative of the Employer for consideration and settlement.

4. Any grievance which cannot be settled pursuant to paragraph 3 of this Section within seven (7) working days shall be referred within 48 hours to the Joint Committee, which shall determine in each case whether the grievance is of a nature to be settled at the regional or national level.

D. Regional Grievances

1. If the Joint Committee agrees that the grievance is of a nature to be settled at the regional level, the grievance shall be referred to the appropriate Regional Joint Administrative Board.  The Regional Board shall have the authority to settle the dispute in accordance with such rules and procedures as the Joint Committee has adopted.

2. If the Regional Joint Administrative Board cannot reach a mutually satisfactory settlement within five (5) working days following a referral of the grievance to the Board, it shall immediately select a mutually acceptable impartial arbitrator from a panel of arbitrators submitted by the Joint Committee to serve with the Regional Board as an arbitration panel.

3. If the Regional Joint Administrative Board cannot agree on an impartial arbitrator, the impartial arbitrator shall be selected from the panel of arbitrators submitted by the Joint Committee in accordance with the rules and regulations of the Federal Mediation and Conciliation Service.

4. The decision of the arbitration panel shall be binding upon all parties.

5. The fee and expenses of the impartial arbitrator shall be borne equally by the jobsite Local Union and the Employer who are the disputing parties.

E. National Grievances

1. If the Joint Committee agrees that the grievance is of a nature to be settled at the national level, then the National Joint Administrative Board shall be authorized to resolve the dispute in accordance with such rules and procedures as the Committee has adopted.

2. If the National Joint Administrative Board cannot reach a mutually satisfactory settlement within five (5) days following a referral of the grievance to the Board, it shall immediately select an

impartial arbitrator to serve with the National Board as an arbitration panel.

3. If the National Joint Administrative Board cannot agree on an impartial arbitrator, the impartial arbitrator shall be selected from a panel of arbitrators submitted by and in accordance with the rules and regulations of the Federal Mediation and Conciliation Service.

4. The decision of the arbitration panel shall be binding upon all parties.

5. The fee and expenses of the impartial arbitrator shall be paid in the following manner: one half by the Joint Committee and one half borne equally by the jobsite Local Union and the Employer who are the disputing parties.

F. The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance, or failure to respond in writing within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice, and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

G. In order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

H. When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties.

ARTICLE X          A. The subletting, assigning or transfer by an
Subcontracting     individual Employer of any work in connection with
                   employment covered by this Agreement to any person,
firm or corporation not recognizing the Bricklayers and Allied Craftsmen or one of its Unions as the collective bargaining representative of his employees on any covered work assignments to be performed at the jobsite on new construction, alteration, additions or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

B. All charges of violations of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

ARTICLE XI         A. In order to protect and preserve, for the employees
Preservation       covered by this Agreement, all work heretofore
of Work            performed by them, to protect the benefits to which
                   employees are entitled under this Agreement, and to
prevent any device or subterfuge to avoid the protection and preservation of such work and benefits, it is hereby agreed as follows: If and when the

Employer shall perform any work of the type covered by this Agreement at any construction site (i) under its own name, (whether a corporation, company, partnership, or any other business entity, including a joint venture) wherein the Employer, including its owners and stockholders, officers, directors, or partners exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

1. A charge of a violation of this Article may be filed by the International Union and/or the trustees of any of the joint trust funds provided for in this Agreement, and shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes as provided in Article III of this Agreement. As a remedy for violations of this Article, the arbitrator (or arbitration body) provided for in Article III is empowered, at the request of the International Union and/ or the trustees of the joint trust funds, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (2) pay into the affected contributory funds established under this Agreement or any applicable local agreement any delinquent contributions to such funds which have resulted from the violations. Provision for this remedy herein does not make such remedy the exclusive remedy available to the International Union for violation of this Article, nor does it make the same or other remedies unavailable to the International Union for violation of other sections or other articles of this Agreement.

2. If, as a result of violations of this Article, it is necessary for the International Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with subsection (1) above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the International Union and/or fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

| | |
|---|---|
| ARTICLE XII<br>Work Rules,<br>Work and Shift<br>Reporting Time,<br>Hours,Stewards,<br>Safety,Scaffold,<br>and Jobsite<br>Conditions | A. There shall be no rules, customs or practices permitted that will limit the productivity of employees.<br><br>The Employer and Union shall , during the pre-job conference, review and reach an agreement on required conditions of employment which are not specifically covered in this Agreement. Payroll hold back provisions and pay day procedures shall be consistent |

with the jobsite Union's area practice. Show up and reporting times for covered employees shall be consistent with those conditions covering the other employees with whom the masons are working on the project.

B. Hours

1. Eight (8) hours work per day shall constitute a day's work, forty (40) hours per week, Monday through Friday, inclusive, shall constitute a week's work. The normal starting time shall be 8:00 AM.

Normal quitting time shall be 4:30 PM. with a thirty (30) minute unpaid lunch period occurring in the middle of the shift. The normal starting and quitting time may be changed by mutual consent of the Employer and the jobsite Local Union. The schedule of approved shifts which can be adopted by mutual consent of the Employer and the Business Manager of the jobsite Local Union is attached as Addendum B. The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule. In the event that the Employer and the jobsite Local Union cannot agree upon the shift schedule requested the matter shall be referred, with full documentation, to the International Union for decision.

2. When more than one (1) shift is required, the shift schedule shall be established in accordance with the procedure contained in paragraph B (1) of this Article. Employees working on second shifts shall receive a twenty-five cents (.25) per hour additive and employees working on third shifts shall receive a fifty cents (.50) per hour additive in accordance with Addendum B. At least six (6) consecutive shifts shall be required to establish a shift operation. When shift schedules, other than those contained in Addendum B or for shorter duration are required by the customer, they may be established by mutual agreement of the Union and the Employer.

3. All time worked before and after the established eight (8) hour work day, Monday through Friday, and all time worked on Saturdays, shall be paid for at the rate of time and one-half the taxable base rate in effect. For purposes of this provision, taxable base rate shall be defined as the remainder of the appropriate rate for the project as contained in Addendum A following the subtraction of the nontaxable contribution rates contained in the jobsite local agreement. All time worked on Sundays and the national holidays recognized in the jobsite Union's Collective Bargaining Agreement shall be paid for at the rate of double the taxable base rate in effect, except as otherwise provided in this Agreement. The Employer agrees to make appropriate contributions to the benefit programs for all overtime hours of employment in accordance with the applicable provisions of the jobsite Union's Collective Bargaining Agreement and the funds' trust documents; provided, however, that the maximum contribution adjustment for overtime hours of employment which will be paid by Employers under local agreements revised after the effective date of this Agreement shall be the applicable overtime rate as established for the taxable base rate under this paragraph.

4. Each employee will be allowed a ten (10) minute period for clean up before lunch and a ten (10) minute period for clean up at the end of the shift.

5. When employees are required to park one-half mile away or more, they shall be provided suitable transportation from parking area to job location including protection during inclement weather. The Employer agrees to provide suitable transportation on projects over one-forth of a mile from the parking lot and storage shed for transportating the employees' tools to and from the jobsite at the beginning and end of the project.

6. No employee shall be allowed to work on more than one (1) shift in a twenty-four (24) hour period.

7. Travel time, subsistence or zone pay allowances called for in the jobsite Union's Collective Bargaining Agreement for specified distances or outlying areas shall be paid by the Employer as additional compensation in the additional amounts specified either directly or as a differential under the jobsite agreement.

### C. Stewards

1. A working steward shall be placed by the Union to represent the Union on all jobs and shall not be discharged for fulfilling his duties. All disputes between the Employer and the employees shall first be taken up with the steward on the job who shall immediately notify the Union Office of the existence of a dispute.

2. The steward shall call time and keep a record of the names of all employees and the hours worked by each and shall make a report of those records to the Union.

3. The steward shall work until the job is completed or a new steward is named by the Union. Additional stewards shall be placed on projects working more than one shift.

### D. Safety

1. The Employer agrees to conform to all rules and regulations prescribed by the Occupational Safety and Health Act or applicable standard.

2. When employees are working on a job and other workmen are working above them, employees shall be provided with a proper covering by the Employer to protect them from danger. No employee shall be required to work in any hazardous location without proper safety precautions.

3. Hardhats, goggles, respirators, and other safety equipment as required shall be furnished by the Employer at no expense to employees.

4. The Employer shall provide respirators to each employee as needed. When working with asbestos based materials, respiratory protective devices shall be appropriate for the hazardous material involved and the extent and nature of the work performed.

5. Eye and face protection shall be provided on any work which presents potential eye or face injury.

6. Employees involved in welding operations shall be furnished with proper welding hood and lenses for eye protection and protective clothing.

7. All welding shall be adequately shielded to protect anyone in the vicinity.

8. The Employer shall take suitable precautions to detect and prevent employees being exposed to toxic gases.

9. When working under other than standard working conditions such as, but not limited to, hot areas or under extra hazardous conditions due to dirt, soot or resinous materials, employees shall be supplied by the Employer with all special tools, shoe protection and protective clothing necessary to perform the required work assignments.

10. Adequate lighting shall be provided.

11. All accidents shall be promptly reported by the job steward to the Union and the Employer. The Employer agrees to establish a procedure for each project which will be reviewed at the pre-job conference to insure that prompt and competent medical attention is available for any workman injured on the jobsite.

12. The Employer shall post in a prominent place at each jobsite pertinent medical and insurance information.

E. Scaffold

1. Secure scaffolds with adequate work platforms and guard rails shall be provided for employees on all work. Swinging or suspended scaffolds shall be kept level. All planking shall be of select structural or premium grade lumber. All solid wooden scaffold lumber shall be of select structural or premium grade.

2. Wall height shall not exceed four (4) feet six (6) inches above the working platform on any work except as otherwise provided in this Agreement.

3. Wall height on coke oven walls shall not exceed three (3) feet six (6) inches. The top of the working platform shall be approximately six (6) inches below the top of the wall. First lift wall height shall be flexible to assure succeeding three (3) feet six (6) inches maximum.

4. Wall height in blast furnaces shall be a maximum of three (3) feet six (6) inches from the top of the working platform. The top of the working platform shall be approximately six (6) inches below the top of the wall. On heavier walls bricklayers shall work an partners to minimize material handling.

All planking shall be of select structural or premium grade lumber. A bench scaffold four (4) feet in width must be installed every thirty (30) inches in blast furnaces. No more than one brick shall be placed under bench scaffold legs for load distribution. When solid scaffolds are used, a solid scaffold must be installed every six (6) feet. Every third scaffold must be left nailed in place for safety purposes.

When a swinging or suspended scaffold is used, a level scaffold shall be maintained with the top of the working platform being approximately six (6) inches below the top of the wall around the entire perimeter of the furnace. The scaffold shall be raised when scaffold height is reached, at lunch or between shifts. Employees shall leave work area while this operation is being performed.

14 of 18

5. In stoves and wells, the top of the working platform shall be approximately six (6) inches below the top of the wall. Wall height shall be a maximum of four (4) feet six (6) inches in height. Every fourth scaffold must be left in place for safety purposes.

6. No scaffold, with the exception of bench scaffolds, shall be started or dismantled until the last course is keyed up and painted with the exception of pudlock holes.

7. All swinging, suspended and self-supporting scaffolds shall meet or exceed OSHA or applicable state standards. Platforms shall be placed at tuyere holes inside and outside to permit easy ingress and egress to blast furnaces.

8. There shall be no lost time during work hours for stocking or building of scaffolds.

9. Access to ladders shall be provided to all scaffolds. All ladders shall conform to OSHA or applicable state standards.

F. Jobsite Conditions

1. Employees must be provided with a suitable shed or room for storage of tools, changing clothes, and eating meals. The shed shall be well lighted, heated during cold weather, and kept clean, and shall be a reasonable distance from the work area. The shed shall be for exclusive use of employees in this bargaining unit. A separate shed shall be provided for each shift. Employer shall furnish adequate sanitary and washing facilities on all jobs.

2. The Employer shall be responsible for loss of tools and/or clothing when such loss is the result of fire or burglary up to $200. Employees shall furnish itemized statement covering any losses due to fire or burglary.

3. Employer shall furnish an adequate supply of potable chilled drinking water on all jobs. All water containers and drinking cups shall comply with state and federal sanitary codes.

4. A line furnished by Employer shall be used on every course, and on backup work, wherever practical. Employees shall not be required to work ahead of the line.

5. All units weighing more than thirty-five (35) pounds shall be laid by two (2) bricklayers. This provision shall not apply to bottom block.

6. To avoid abuses in blast furnace work, every effort shall be made to keep the lead no more than four (4) courses ahead of the key. Bricklayers shall work together to level up the wall and key all courses. Bricklayers shall not start more than one course of bottom block at a time unless no grinding is involved.

7. Backfill and vibrating of all refractory materials with electrical vibrators, air vibrators or any other methods shall be performed by bricklayers. When dry packing is used, air horns shall be installed for proper ventilation. The ventilation shall be determined by OSHA or applicable state standards.

8. Coke oven walls over eighteen (18) inches thick shall be saddled by two (2) bricklayers and the line shall be raised on both sides at the same time.

9. When insulation is required to be installed on the interior of a vessel in conjunction with refractory materials, insulation shall be installed at least to scaffold height before brick or other materials are stockpiled, whenever possible.

10. Employer shall make substantial effort to control or eliminate dust wherever possible.

11. When an employee is laid off or discharged, he shall be paid in full all compensation due one-half hour before layoff.

12. The Union and Employer agree that no employee shall be denied employment, penalized, disciplined, or in any other way disadvantaged because of age, race, religion, sex or place of national origin.

13. When bricklayers are employed on hot work, Employer shall provide proper counter fatigue aids which shall meet OSHA or applicable state standards.

14. Tools shall be sharpened at the Employer's expense. If tools are not sharpened, carboloy tips shall be furnished and installed at the Employer's expense.

15. When employees are sent from one job to another during working hours, they shall be compensated at the regular rate of pay for their time and in no case may they be moved during their lunch period.

16. Apprentices shall not be permitted to operate saws until they have completed at least twenty-four (24) months of their apprenticeship.

17. Dry cutting and wet cutting precautions: Where dry cutting machines are used, the Employer shall furnish a mask to cover the operator's mouth and nose and shall also furnish safety goggles and ear protection where required; and where wet cutting machines are used, there shall be furnished in addition to the above-mentioned safety articles: A pair a rubber gloves, rubber apron and a dry elevated platform. Enclosure and heat shall be provided during winter months for wet cutting on saw. All dry cutting machines used by employees are to be furnished with some mechanical or suction device to draw and keep away dust at all times from the operator; and all cutting machines shall be grounded before operated, the ground wire to be not less than #8 wire.

18. Masonry power saws shall be operated only by an employee in the bargaining unit and only on the site of the operation.

Both safety shield and dust collector must be kept in good condition whenever saw is in operation.

       19. Employees may be required to take a physical exam as a requisite for employment when required by a governmental agency or owner.

       20. No employee shall be required to give information other than the following on employment application: Name, address, phone number, age, social security number, and persons to be notified in case of emergency.

       21. The Employer must carry liability, workmens' compensation and unemployment insurance in the state where the job is located for all employees covered under this bargaining agreement. Proof of same shall be provided to the Union upon request.

ARTICLE XIII
No Strike,
No Lockout

A. It is understood and mutually agreed upon that there shall be no strikes or lockouts over a dispute concerning the Agreement during its term until the grievance procedures described in Article IX have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

       B. There shall be no stoppage of work on an Employer's project by the Union or any lockout by the Employer by reason of any dispute over wages or working conditions which may occur between a Union and area contractors other than the Employer; provided that refusal by any employee to pass through a lawfully permitted picket line will not constitute a violation of this Agreement. It is agreed, however, that in the event that either the owner or general contractor makes a decision to shut down a project during such a local work stoppage, the Employer shall be permitted to cease operations without recourse by either the International Union or Union during the period that the project has been shut down by the owner or general contractor. Under no circumstances, however, shall either the Employer or the Union make the decision or cause the decision to be made to shut down a covered project during a work stoppage in support of a dispute between the Union and area contractors other than the Employer.

ARTICLE XIV
Savings Clause

If any provision of this Agreement shall violate any applicable statute or is held invalid by any court or governmental agency having jurisdiction, then such provision shall be void and the Employer and the International Union agree that upon a ruling of invalidity they will renegotiate immediately to replace the voided provision with one that incorporates the substance of the voided provision to the extent allowable under the law, providing such invalidity shall not effect the validity of the remainder of this Agreement. Where a money item is involved and no substitute is possible, it is agreed that the benefit originally provided shall be replaced with one of equal worth.

ARTICLE XV
General
Understanding

The International Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the International Union respecting any questions or misunderstandings that may arise under the performance of this Agreement.

The International Union agrees that the Employer has the option of working refractory projects either under this Agreement or under the applicable jobsite local union agreement; and the Employer shall notify the International Union as to which option he exercises prior to the commencement of the project. Once a project is started, however, under either this Agreement or the jobsite local union agreement, the project must be worked to its completion under the same agreement. The Employer agrees to accept and be bound by the terms and conditions of the jobsite local union agreement for those projects which it decides to work under such local agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area collective bargaining agreement which may be in conflict with the provisions contained in this Agreement shall be subordinated to this Agreement.

Signed this _____ _19th_ day of _February_ _____ , 19 _90_ .

_Empire Refractory Specialists Inc._
EMPLOYER

_Louis Weir_
BRICKLAYERS & ALLIED CRAFTSMEN
NATIONAL REFRACTORY COMMITTEE

By _Donald C Snell_

Title _V.P. / General Mgr._

Date _2 - 19 - 90_

Date _March 15, 1990_

18 of 18

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

JOHN FLYNN, et al.

**DEFENDANTS**

EMPIRE REFRACTORY SPECIALISTS, INC.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

11001

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ira R. Mitzner (202) 420-2200
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

● 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency
Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**         OR         ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| **G. Habeas Corpus/ 2255** | **H. Employment Discrimination** | **I. FOIA/PRIVACY ACT** | **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| **K. Labor/ERISA (non-employment)** | **L. Other Civil Rights (non-employment)** | **M. Contract** | **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ◯ 2 Removed from State Court  ◯ 3 Remanded from Appellate Court  ◯ 4 Reinstated or Reopened  ◯ 5 Transferred from another district (specify)  ◯ 6 Multi district Litigation  ◯ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
ERISA - Complaint filed for recovery of delinquent contributions - 29 U.S.C. Sections 1002, 1132, 1145

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  9/7/07   SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.